UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ANDREW R. DUPREE, Plaintiff, v. APPLE, INC, Defendant. | Case No. 16-CV-00289-LHK **ORDER GRANTING SUMMARY JUDGMENT** Re: Dkt. No. 76 |

Plaintiff Andrew Dupree ("Plaintiff") brings this action against Apple, Inc. ("Defendant"). Before the Court is Defendant's motion for summary judgment on all claims in Plaintiff's Third Amended Complaint ("TAC"). ECF No. 76 ("Mot."). Having considered the submissions and oral arguments of the parties, the relevant law, and the record in this case, the Court GRANTS Defendant's motion for summary judgment.

## I. BACKGROUND

### A. Factual Background

On February 15, 2011, Plaintiff began working as a retail specialist for Apple, Inc. ("Apple") at Apple's retail store at the Millenia Mall in Orlando, Florida (the "Millenia Mall store"). Second Amended Complaint ("SAC"), ECF No. 36 ¶ 5. Plaintiff, an African American

man, alleges that a manager at the Millenia Mall store told Plaintiff that "[b]lacks don't make management in this market." *Id.* ¶ 9. "[S]hocked, embarrassed, and humiliated by this comment," Plaintiff requested and was granted a transfer to the Apple retail store in Sydney, Australia (the "Australia store"). *Id.* ¶ 10. Plaintiff began working in Australia on July 27, 2012. *Id.* ¶ 11.

On July 9, 2013, Plaintiff decided to transfer back to the Millenia Mall store and contacted Millenia Mall store leadership. *Id.* ¶ 15. Plaintiff avers that Millenia Mall store leadership indicated that they would be receptive to Plaintiff's return, and Plaintiff returned to Florida on July 28, 2013. *Id.* ¶ 20. On August 22, 2013, however, Millenia Mall store leadership contacted Plaintiff and informed him that he would not be rehired.

Upon learning this news, Plaintiff sent emails to Apple CEO Tim Cook ("Cook") and Apple Human Resources representatives Brenda Everson ("Everson") and Susan Pierre-Zilles ("Zilles"). *Id.* ¶¶ 27–28. In response to these emails, Everson informed Plaintiff on October 10, 2013 that management at Apple's retail store in Central Florida "would be contacting him regarding a possible position." *Id.* ¶ 31. On December 2, 2013, Plaintiff was hired at the Central Florida Apple retail store (the "Central Florida store"). *Id.* ¶ 33.

While working in Central Florida, Plaintiff alleges that he was discriminated based on his race and national origin. Plaintiff states that he was disciplined for wearing a "baseball cap with a logo on store grounds," while it was "common for [other] employees to wear these types of baseball caps with no disciplinary action taken." *Id.* ¶ 35. Plaintiff also alleges that he was falsely reported as being late, that his work schedule was changed without his knowledge, and that he was threatened by his manager. *Id.*

In September 2015, Plaintiff transferred to the Apple retail store in Los Gatos, California (the "California store"). ECF No. 28 at 10. During his tenure in Los Gatos, Plaintiff alleges that he continued to be subject to racial discrimination. Plaintiff points specifically to five incidents. According to the Third Amended Complaint ("TAC"), these incidents are as follows. First, a corporate Apple employee who had asked Plaintiff to help fix her Apple device allegedly called Plaintiff "Oakland" because Plaintiff "must not be from around here." TAC ¶ 19. Second, another

Apple corporate employee allegedly asked whether Plaintiff was "part of some kind of new diversity program" when the employee became frustrated with Plaintiff's service. *Id.* ¶ 22. Third, when Plaintiff was working a shift at the Cupertino Apple Store, another Apple corporate employee "stated [that] she wanted to work with someone more professional looking and not someone who looked like they were 'part of a gang.'" *Id.* ¶ 27. Most recently, in 2016, Plaintiff alleges that one of his coworkers threatened to "punch [Plaintiff] in the face," that another coworker yelled at Plaintiff for no reason, and that another co-worker switched shifts with Plaintiff without Plaintiff's knowledge or consent. *Id.* ¶¶ 32–34.

Plaintiff took a medical leave of absence from his employment at Apple on February 8, 2016, but has remained on Apple's payroll since that time. ECF No. 76-2, at 19; June 18, 2017 Hearing Transcript, at 15 ("He's still working at Apple, not actively. He's on a leave of absence, but he remains on the payroll."). Plaintiff has been receiving worker's compensation as part of his medical leave. June 8, 2017 Hearing Transcript, at 16.

## B. Procedural History

### 1. *Dupree I*

On July 22, 2014, Plaintiff filed a complaint against Apple which alleged discrimination on the basis of race and national origin in violation of Title VII of the Civil Rights Act ("Title VII"). *Dupree v. Apple Inc.* ("*Dupree I*"), No. 14-CV-3294 (N.D. Cal.). The complaint was filed in the Northern District of California but focused on events occurring at the Millenia Mall store in Orlando, Florida. *Id.* at 6. Accordingly, on March 11, 2015, U.S. District Judge Edward Davila, to whom *Dupree I* was assigned, granted Apple's motion to transfer *Dupree I* to the Middle District of Florida. *Dupree I*, ECF No. 46. As Judge Davila noted, "Apple has demonstrated based primarily on Plaintiff's allegations that most if not all of the critical events giving rise to Plaintiff's claims occurred in or around [an] Orlando Apple store." *Id.* at 3.

On March 16, 2015, *Dupree I* was officially transferred into the Middle District of Florida and was assigned to U.S. District Judge Kendall Sharp. *Dupree v. Apple Inc.*, No. 15-CV-0423 (M.D. Fla.), ECF No. 47. On April 7, 2015, Judge Sharp granted Plaintiff's motion for leave to

amend his complaint. *Dupree I*, ECF No. 62. Plaintiff's amended complaint added Cook, Zilles, and Everson as Defendants, and alleged causes of action based upon violations of Title VII, the California Fair Employment and Housing Act ("FEHA"), and 42 U.S.C. § 1981.

On April 24, 2015, Defendants moved to dismiss certain causes of action in Plaintiff's first amended complaint. On June 30, 2015, Judge Sharp granted Defendants' motion to dismiss. *Dupree I*, ECF No. 69 ("*Dupree I* MTD"). First, Judge Sharp held that Plaintiff could not move forward with Plaintiff's FEHA claims because FEHA does not apply to conduct occurring outside of California. Next, Judge Sharp held that Plaintiff could not bring a Title VII claim against Cook, Zilles, and Everson because "individual capacity suits under Title VII are inappropriate." *Id.* at 7 (alterations omitted). Finally, Judge Sharp determined that Plaintiff had failed to state a cause of action under 42 U.S.C. § 1981 against Cook, Zilles, and Everson. *Id.* at 9. Judge Sharp also concluded that amendment would be futile, and granted Defendants' motion to dismiss with prejudice. Because Defendants did not move to dismiss all causes of action against all Defendants in *Dupree I*, a portion of Plaintiff's first amended complaint survived dismissal.

On September 29, 2015, Judge Sharp granted Plaintiff's motion to dismiss Plaintiff's surviving claims in *Dupree I* without prejudice, as "Plaintiff wishe[d] . . . to end litigation of this matter without incurring further expenses." *Dupree I*, ECF No. 84.

### 2. *Dupree II*

On January 19, 2016, Plaintiff filed the original complaint in the instant action. ECF No. 1 ("Compl."). The complaint asserted claims based on events occurring in the Millenia Mall store, the Central Florida Store, the Los Gatos store, and the Cupertino store. The Court shall refer to all proceedings in the instant action as *Dupree II*. Plaintiff filed a motion for leave to amend on April 11, 2016, which Defendants did not oppose. ECF No. 23. Accordingly, the Court granted Plaintiff's motion to amend on the record at the April 27, 2016 initial case management conference. ECF No. 32.

On May 25, 2016, Plaintiff filed another motion for leave to amend. ECF No. 33. Defendants also did not oppose this second motion to amend. ECF No. 37. Plaintiff referred to

the proposed amended complaint as the "First Amended Complaint." ECF No. 36. As the procedural history demonstrates, however, Plaintiff's May 25, 2016 motion in fact sought leave to file a third complaint in *Dupree II*. Accordingly, the Court granted Plaintiff's May 25, 2016 motion for leave to amend, but stated that it would refer to the "proposed amended complaint as the 'Second Amended Complaint' or 'SAC' in . . . all future Orders." ECF No. 38 at 2.

Defendants moved to dismiss the SAC on June 29, 2016. On August 9, 2016, the Court granted the motion to dismiss. ECF No. 44. First, the Court found that the statute of limitations had expired for Plaintiff's claims related to events at the Millenia Mall Store and the Central Florida Store. ECF No. 44, at 6–10. Second, the Court found that FEHA did not apply to conduct outside California and therefore dismissed Plaintiff's FEHA claims for events at the Millenia Mall Store and the Central Florida Store. *Id.* at 10. Third, the Court dismissed Plaintiff's claim under the Civil Rights Act of 1991 because the Civil Rights Act of 1991 does not provide a substantive cause of action but instead only provides additional remedies for other causes of action. *Id.* at 10–11. Fourth, the Court dismissed Plaintiff's claim for intentional infliction of emotional distress with prejudice to the extent that the claim arose from events before January 19, 2014, because the statute of limitations for claims for intentional infliction of emotional distress is two years before the filing of the *Dupree II* complaint on January 19, 2016. *Id.* at 11. The Court also dismissed Plaintiff's intentional infliction of emotional distress claim without prejudice to the extent that it arose from events after January 19, 2014, including the incidents in which corporate employees made racially insensitive statements. *Id.* at 11–18. The Court found that the employees who allegedly made racially insensitive comments were not acting within the scope of their employment because "[t]hese employees sought assistance with their personal Apple devices and personal Apple purchases" and thus were on "personal errands." *Id.* at 16. The Court also found that other incidents at the Millenia Mall Store and the Central Florida store were either "personnel management activity [that] is insufficient to support a claim of intentional infliction of emotional distress" or did not constitute "extreme and outrageous conduct." *Id.* at 11–18.

After the Court granted Defendant's motion to dismiss, Plaintiff obtained the assistance of

counsel, ECF No. 47, and filed a Third Amended Complaint ("TAC") on September 8, 2016. ECF No. 48. On October 11, 2016, Plaintiff filed a motion for leave to file a Fourth Amended Complaint, in which Plaintiff sought to assert three new causes of action: a claim for disparate impact discrimination based on race and/or national origin, a claim for failure to prevent harassment and discrimination, and a claim for assault. ECF No. 51. The Court denied this motion on January 18, 2017, on the grounds that Defendant would be prejudiced by further delay after Plaintiff had already amended his complaint six times between two different lawsuits before three different judges. ECF No. 70.

On January 17, 2017, Plaintiff filed a motion to substitute himself appearing pro se in place of his attorney. ECF No. 69. The Court granted this motion on January 18, 2017. ECF No. 71. Therefore, although Plaintiff is now representing himself pro se, the operative complaint in this case, the TAC, was drafted and filed when Plaintiff was represented by an attorney.

On April 27, 2017, Defendant filed a motion for summary judgment on all claims in the TAC. ECF No. 76. Plaintiff filed an opposition on May 11, 2017. ECF No. 79. Defendant filed a reply on May 18, 2017. ECF No. 84.

On May 30, 2017, Plaintiff filed a motion to appoint counsel. ECF No. 86. On May 30, 2017, Plaintiff also filed a request for the Court to allow Plaintiff to orally argue his opposition to the motion for summary judgment. ECF No. 87. On June 8, 2017, the Court held a hearing on the motion for summary judgment. ECF No. 91.

## II.   LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those

6

portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. However, on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The court is only concerned with disputes over material facts and "factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

At the summary judgment stage, the court must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

## III. DISCUSSION

As discussed above, Plaintiff's TAC, which was drafted with the assistance of counsel, asserts eight causes of action against Defendant: (1) discrimination based on race, color, and national origin under Title VII; (2) discrimination based on race, color, and national origin under FEHA; (3) retaliation under Title VII; (4) harassment under Title VII; (5) harassment and creation of a hostile work environment under 42 U.S.C. § 1981; (6) creation of a hostile work environment under FEHA; (7) intentional infliction of emotional distress; and (8) violation of California's

7

Ralph Civil Rights Act. TAC ¶¶ 39–104.

Defendant moves for summary judgment on all eight of Plaintiff's causes of action. The Court first discusses the events underlying Plaintiff's claims and then the Court considers each of Plaintiff's causes of action.

### A. Events Underlying Plaintiff's Claims

Before addressing Plaintiff's claims, the Court first reviews the five events that, according to the TAC, underlie Plaintiff's claims.[1] The TAC alleges that the first event, the "Oakland incident," occurred in "mid-September 2015" at the Los Gatos Apple Store. TAC ¶ 19. According to the TAC, a customer entered the Los Gatos Apple Store, informed Plaintiff that she "worked for Apple's corporate office," and asked Plaintiff to have the customer's personal cell phone hardware repaired. *Id.*; *see also* Pl.'s Depo. at 55:13–56:8, ECF No. 76-1; ECF No. 44, at 16 . Plaintiff informed the corporate employee that she needed to make an appointment with a technician rather than speaking to Plaintiff, who was a Retail Specialist. TAC ¶ 19. The corporate employee then told Plaintiff that she was uncomfortable working with Plaintiff. *Id.* The corporate employee also stated that Plaintiff "must not be around here" and asked Plaintiff if he was from Oakland. Thereafter, the corporate employee referred to Plaintiff as "Oakland" several times. Plaintiff took the corporate employee to his manager, Kris Mallonee, who talked with the corporate employee. *Id.* The corporate employee then left and stated that she would come back at another time. *Id.* While the corporate employee was leaving, she said "bye Oakland" to Plaintiff. Plaintiff testified that at the time of the incident, he did not understand why the corporate employee called him "Oakland," but Plaintiff later realized that this was a racial epithet because "Oakland is where most of [the] minorities are located" in the Bay Area. *Id.* at 56:5.

As discussed above, in the TAC, Plaintiff alleged that the customer involved in the Oakland Incident was a "corporate employee" who "stated that she worked for Apple's corporate

---

[1] The TAC also mentions one event in which another co-worker allegedly yelled at Plaintiff to leave the inventory room. TAC ¶ 33. However, the TAC does not allege that this action was taken because of Plaintiff's race or any other protected characteristic, and none of the claims in the TAC appear to be based on this incident.

8

office." TAC ¶ 19. Plaintiff also alleged that the customer involved in the Oakland Incident was a corporate employee in the original complaint, the FAC, the SAC, and the proposed Fourth Amended Complaint. ECF No. 1, at 13–14; ECF No. 26, at 19; ECF No. 36, at 14; ECF No. 51-1, ¶¶ 19–27.

However, in Plaintiff's February 17, 2017 deposition, Plaintiff stated for the first time that this customer was in fact Kendall McInerney, who was one of Plaintiff's co-workers at the time and who worked at the Los Gatos store from December 5, 2014 to October 14, 2015.[2]

According to Plaintiff's testimony, Plaintiff first learned the true identity of this customer more than two years after the alleged incident, in December 2016 or January 2017, from Plaintiff's brother Andre Dupree and Andre Dupree's business partner, Damien Barclay. Pl.'s Depo. at 60:1–10. Plaintiff testified that although Dupree and Barclay lived in Florida, they were visiting the Bay Area and happened to come to the Los Gatos Apple Store to pick up Plaintiff at the time of the "Oakland" incident. *Id.* at 60:12–17. Plaintiff testified that Barclay entered the store at the time of the incident heard McInerney say her name and heard McInerney say that she was on the clock. *Id.* at 60. Barclay has filed a declaration dated December 29, 2016, in which Barclay states that he witnessed the Oakland Incident and that the customer involved was "a blonde Apple employee by the name of Kendall McInerney." ECF No. 82, at 1. Barclay's declaration does not describe how Barclay knew the employee's name. Despite learning this information at the time of the incident, Barclay did not inform Plaintiff of McInerney's identity until over a year later in December 2016 or January 2017.

The second event, the "Diversity Program Incident," occurred sometime after the Oakland Incident. *Id.* at 65:5–19.[3] According to the TAC, Plaintiff had been told earlier in the week to "be

---

[2] The timing of the Oakland Incident is uncertain. Although the TAC states that the Oakland Incident occurred in mid-September 2015, at the June 8, 2017 hearing on the instant motion, Plaintiff stated that the Oakland Incident must have occurred between October 3, 2015, when Plaintiff states that his co-workers "were nice to me" and took Plaintiff out for his birthday, and October 14, 2015, when Kendall McInerney, who was allegedly involved in the incident, stopped working at the Los Gatos Apple Store. Transcript at 22.
[3] In the TAC, Plaintiff alleged that the Diversity Program Incident occurred "[i]n or around October 2015." TAC ¶ 22. However, at the time of his deposition, Plaintiff testified that he did not

9

prepared for corporate employees to come into the store and do assessments based on 'interactions' any time that week." TAC ¶ 22. Thereafter, a corporate employee entered the Los Gatos Apple Store and "Plaintiff was informed that the corporate employee was on-site assessing the store and wanted to do a quick return since he was already here and almost done with the store assessment." *Id.* Specifically, the corporate employee wanted to return a personal item that the employee "had purchased using his Apple corporate discount." *Id.* Plaintiff informed the corporate employee that the refund might be delayed because "it systematically took 24 to 48 hours for an Apple corporate discount to be reset and be eligible to be used again." *Id.* at 66:11–12. The corporate employee then "got upset" and asked Plaintiff if he was "part of some kind of new diversity program here or something." *Id.* Plaintiff then approached his manager, Kris Mallonee, who was nearby. Mallonee told Plaintiff that his statement about the delay in the refund was correct and told Plaintiff that she would come to help Plaintiff when Mallonee was finished talking to another customer. *Id.* By the time Plaintiff returned to speak to the corporate employee again, the corporate employee had left. Pl.'s Depo. at 67:21–22. Plaintiff was "visibly shaken" by this incident, and Mallonee told Plaintiff that he could "take a break to gather himself." TAC ¶ 22.

Similar to the "Oakland Incident," as discussed above, in the TAC Plaintiff alleged that the customer involved in the Diversity Program Incident was an Apple corporate employee performing a store assessment. *Id.* Plaintiff also alleged that this customer was a corporate employee in the original complaint, the FAC, the SAC, and the proposed Fourth Amended Complaint. ECF No. 1, at 13–14; ECF No. 26, at 19; ECF No. 36, at 14; ECF No. 51-1, ¶¶ 19–27.

However, in Plaintiff's February 17, 2017 deposition, Plaintiff stated for the first time that this customer was in fact Jackson Partin, who was Plaintiff's co-worker at the Los Gatos Store and worked as a Specialist at the store from November 20, 2015 and June 26, 2016, and again from

_____

know even "approximately" when the Diversity Program Incident occurred, and Plaintiff could not provide "an estimate as to how much time passed between the Oakland statement and the diversity program statement." Pl.'s Depo at 65:5–19. Jackson Partin, the employee who was allegedly involved in the Diversity Program incident, did not begin working at the Los Gatos Store until November 20, 2015. Cowan Decl. ¶ 13.

10

December 10, 2016 and January 14, 2017. Cowan Decl. ¶ 13. As with the Oakland Incident, Plaintiff testified that his brother Andre Dupree and Andre Dupree's business partner, Damien Barclay, were visiting from Florida and happened to be present at the Los Gatos store during the Diversity Program Incident. Pl.'s Depo at 68–72. Plaintiff testified that he was unsure how Dupree or Barclay knew Partin's name, but Partin was "talking to somebody else while I was gone" and Partin "could have said [his name]" at that time. *Id.* at 72:21–25. Dupree and Barclay both filed declarations claiming, in almost identical statements, that Dupree and Barclay entered the store and witnessed the incident. ECF Nos. 82–83. Specifically, Dupree and Barclay claim that they saw an employee speaking to Plaintiff and that in the course of the conversation, the employee stated that his name was Jackson. *Id.* Dupree and Barclay also claim when Plaintiff stepped away from the conversation, the employee stated that he was still on the clock. *Id.* However, Dupree and Barclay did not inform Plaintiff about Partin's identity until December 2016 or January 2017.

After the Diversity Program Incident, Plaintiff had a meeting with Mallonee and Store Leader Lindsay Ward. At the meeting, Plaintiff told Mallonee and Ward about the Oakland Incident and the Diversity Program Incident and stated that both incidents had involved customers at the store. Ward Decl. ¶ 5; Mallonee Decl. ¶ 4; Pl.'s Depo. at 146:4–147:2. Mallonee and Ward offered Plaintiff emotional support. Mallonee gave Plaintiff a "side-hug" and told him to notify Mallonee or another manager if he ever felt uncomfortable at work. Mallonee Decl. ¶ 9. Mallonee also stated that she would "keep an eye out" for any future incidents. Pl.'s Depo. at 149.22-150:3.

The third event, the "Gang Incident" occurred in "in or about November 2015," when Plaintiff was working a one-day shift at the Apple Store in Cupertino, California. TAC ¶ 26. According to the TAC, during Plaintiff's shift, a corporate employee visited the store in order to conduct a store tour with the store manager "to assess what overall store improvements need to be made." *Id.* ¶ 27. However, the corporate employee decided to do a personal pickup while waiting for the store tour, and another employee led the corporate employee to Plaintiff for assistance. *Id.* When the corporate employee learned that Plaintiff would be assisting the corporate employee, the corporate employee stated that she had a complicated order and was in a hurry. *Id.* ¶ 27. The

corporate employee then said that she did not want to be helped by someone who looked like they were "part of a gang," or a similar statement to the same effect. *Id.* ¶ 27, Pl.'s Depo at 167:6–7.

As with the Oakland Incident and the Diversity Program Incident, Andre Dupree and Damien Barclay claim that they were visiting from Florida and were present during the Gang Incident. ECF Nos. 82–83. Dupree and Barclay state that they heard the employee involved in the incident state that she was working at the Cupertino Apple Store temporarily and that usually she worked at "the other [A]pple location." ECF No. 82, at 1; ECF No. 83, at 1. Dupree and Barclay do not assert that the employee was a corporate employee or that the employee was conducting a store tour. Dupree and Barclay also do not claim that they learned the employee's name.

After the Gang Incident, Plaintiff again talked to Mallonee, who again told Plaintiff that if he had any future problems, Plaintiff should tell a manager and that Mallonee would "try[] to keep an eye out in case anything like that should happen again . . . ." Pl.'s Depo at 149:22–150:3. At some point, Plaintiff had a third conversation with Mallonee in which Mallonee allegedly said that Plaintiff should "[g]row thicker skin" and "let their comments roll off your back." *Id.* at 150:25.

The fourth event, the "Shift Change Incident," occurred in late 2015 and involved Plaintiff's co-worker Chad Flores. According to the undisputed evidence, Flores and Plaintiff were "good friends." ECF No. 76-2, at 17; *see also* Pl.'s Depo. at 109:25–110:1. Flores asked Plaintiff if Plaintiff would be willing to take over a shift for Flores on a Friday. According to Flores, Plaintiff verbally stated "of course." ECF No. 76-2, at 17. According to Plaintiff, Plaintiff told Flores that Plaintiff would "have to check with my girlfriend" and would "get back to him." *Id.* at 13. Flores then informed a manager by email that Plaintiff had agreed to take the shift. Flores cc'd Plaintiff on the email, but Plaintiff did not respond to the email. *Id.* at 17. Although Flores admits that the manager should have waited for Plaintiff to respond, the manager nevertheless agreed to make the shift change. *Id.* Plaintiff stated that when he came to work on the Wednesday or Thursday before the Friday shift, Plaintiff saw that he was scheduled to work on Friday. *Id.* at 13. Plaintiff was then late for the Friday shift and was marked tardy. *Id.* Plaintiff confronted Flores about the incident and claimed that Plaintiff had not consented to the change. *Id.* A manager then

intervened and talked with Flores and Plaintiff. Flores apologized to Plaintiff for making the shift change without confirmation and "gave [Plaintiff] a hug." *Id.* at 17.

The fifth event, the "Back of House Incident," occurred on January 31, 2016 and involved Plaintiff's co-worker Marina Wright. Wright and Plaintiff were friends. Pl.'s Depo. at 132:6–12. Wright worked in the "back of house," which is Apple's term for the inventory area behind a store's retail space. On January 31, 2016, Wright asked Plaintiff about the location of a laptop computer that a customer had recently returned. Plaintiff responded, "Don't worry about it." Ward Decl., Ex. A. Wright asked the question again, and Plaintiff again responded the same way. Then, as Plaintiff walked away, Wright said, "I need the MacBook, or I'm going to punch you in the face." Mallonee Decl., ECF No. 76-3, Ex. A–B. All witnesses to the incident except Plaintiff stated that Wright was speaking in a joking tone. Plaintiff responded, "That's exactly what you're not going to do, and I don't appreciate you talking to me like that." Pl.'s Depo. at 138:11–23.

Later that same day, Wright approached Mallonee, the store manager, and told her that she had intended to make a joke to Plaintiff but had spoken in an unprofessional way and may have damaged her relationship with Plaintiff. Mallonee and Ward, the Store Leader, then began an investigation. After the investigation, Wright received a written "Misconduct" based on the event.

In addition to the five events alleged in the TAC, Plaintiff also discusses two additional events in Plaintiff's opposition to Defendant's motion for summary judgment. First, Plaintiff claims that Apple "repeatedly sought to assign Plaintiff shifts in its Cupertino store even though Plaintiff did not want to return to that store, because of racial comments he had experienced there." Opp. at 21. Additionally, in the opposition, Plaintiff states several times that employees at Apple who were once his friends are now distant and hostile. *See* Opp. at 8 ("[E]veryone at Apple who was once friendly towards Plaintiff is now indeed hostile . . . .").

With these events in mind, the Court next considers each of Plaintiff's causes of action.

**B. Discrimination Based on Race, Color, and National Origin under Title VII and FEHA and Retaliation Under Title VII**

The Court first considers Plaintiff's two discrimination claims under Title VII and the

13

1  FEHA, respectively, and Plaintiff's retaliation claim under Title VII together. Both Title VII and

2  FEHA prohibit discrimination in making employment decisions on the basis of race and retaliation

3  for protected activity. The Court applies the same framework to Plaintiff's state and federal claims

4  because California law under FEHA mirrors federal law under Title VII. *See Lam v. City & Cnty.*

5  *of San Francisco*, 2012 WL 1253199, at *21 (N.D. Cal. Apr. 13, 2012) (citing *Trujillo v. N. Co.*

6  *Transit Distr.*, 63 Cal. App. 4th 280, 289, 73 Cal. Rptr. 2d 596 (1998); *Tritchler v. Cnty. of Lake*,

7  358 F.3d 1150, 1155 (9th Cir. 2004).

8       Under Title VII and FEHA, in the absence of direct or circumstantial evidence of

9  discriminatory intent, as here, Plaintiff must establish a disparate treatment discrimination case

10  using the framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). If

11  Plaintiff establishes a *prima facie* case, the burden shifts to Defendant to articulate a legitimate,

12  non-discriminatory reason for its action. *Id.* If Defendant articulates a legitimate, non-

13  discriminatory reason, the burden shifts back to Plaintiff to demonstrate that the employer's stated

14  reason was a pretext for unlawful discrimination. *Id.* In order to establish a *prima facie* case of

15  discrimination, Plaintiff must show that: (1) he is a member of a protected class; (2) he was

16  qualified for his position and was performing his job satisfactorily; (3) he experienced an adverse

17  employment action; and (4) similarly situated individuals outside of his protected class were

18  "treated more favorably, or other circumstances surrounding the adverse employment action give

19  rise to an inference of discrimination." *Hawn v. Executive Jet Mgmt., Inc.*, 615 F.3d 1151, 1156

20  (9th Cir. 2010) (citing *Peterson v. Hewlett–Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004).

21       Title VII also forbids employers from retaliating against employees for activity that is

22  protected under Title VII. "Retaliatory discharge claims follow the same burden-shifting

23  framework described in *McDonnell Douglas*." *See Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th

24  Cir. 2011). "To establish a prima facie case, the employee must show that he engaged in a

25  protected activity, he was subsequently subjected to an adverse employment action, and that a

26  causal link exists between the two." *Id.* (citing *Jordan v. Clark*, 847 F.2d 1368, 1376 (9th Cir.

27  1988)).

28

14

Thus, Plaintiff's discrimination claims under Title VII and FEHA and Plaintiff's retaliation claim under Title VII all require Plaintiff to show that he was subjected to an "adverse employment action." *See Dimitrov v. Seattle Times Co.,* 230 F.3d 1366 (9th Cir. 2000) ("A plaintiff seeking to prove employment discrimination must show that he suffered an adverse employment action."). Generally, an adverse employment action is one that "materially affect[s] the compensation, terms, conditions, or privileges of . . . employment." *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1126 (9th Cir. 2000). "Not every employment decision amounts to an adverse employment action." *Strother v. S. California Permanente Med. Grp.*, 79 F.3d 859, 869 (9th Cir.1996). "Among those employment decisions that can constitute an adverse employment action are termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion." *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). On the other hand, "mere ostracism in the workplace is not enough to show an adverse employment decision." *Id.* (citation omitted).

Applying this standard, the Court finds that Plaintiff has not identified any adverse employment action that was taken against him. This alone shows that Plaintiff cannot establish a *prima facie* case for either his discrimination or retaliation claims. Therefore, the Court need not consider the other elements of Plaintiff's discrimination and retaliation claims.

Plaintiff's TAC, which was drafted and filed with the assistance of counsel, mentions five alleged adverse employment actions: the Oakland Incident, the Diversity Program Incident, the Gang Incident, the Shift Change Incident, and the Back of House Incident. In Plaintiff's opposition for summary judgment, Plaintiff also mentions as alleged adverse employment actions Defendant's offers for shifts at Cupertino and the fact that employees at Apple who were once his friends are now distant and hostile. Opp. at 8, 21. None of the events mentioned in either the TAC or Plaintiff's opposition to the motion for summary judgment rises to the level of an "adverse employment action." The Court first addresses the Oakland Incident, the Diversity Program Incident, and the Gang Incident together.

Plaintiff has provided no evidence regarding the identity of the customer involved in the

1   Gang Incident. Additionally, even if Plaintiff is correct that his co-workers were involved in the

2   Oakland Incident and the Diversity Program Incident, the undisputed evidence shows that these

3   co-workers were not Plaintiff's managers or supervisors and had no authority to make decisions

4   about Plaintiff's employment. Regan Cowan, a member of Apple's Retail Employee Relations

5   team, filed a declaration stating that she has "reviewed the employment records" of Kendall

6   McInerney and Jackson Partin and stated that both employees "had no supervisory authority over

7   Andrew [Dupree] or any other co-worker, such as the power to hire, fire, promote, or discipline."

8   ECF No. 76-2, at ¶¶ 11–13. Plaintiff does not contend that McInerney and Partin were supervisors.

9           Additionally, as the Court has previously held, the employees involved in the Oakland

10  Incident, the Diversity Program Incident, and the Back of House Incident were acting outside of

11  the scope of their employment. *Dupree v. Apple, Inc.*, 2016 WL 4191653, at *11 (N.D. Cal. Aug.

12  9, 2016). In granting the motion to dismiss the SAC, the Court on August 9, 2016 found that "[t]he

13  unidentified Apple employees in the instant case who made racially discriminatory comments

14  were on personal errands." *Id.* However, the Court granted Plaintiff leave to amend on this issue

15  because "[i]t [wa]s possible" that Plaintiff could plead other facts showing "that these employees

16  were acting within the scope of their employment." *Id.* at 10.

17          However, with the benefit of full discovery, the undisputed evidence confirms that the

18  employees involved in the Oakland Incident, the Diversity Program Incident, and the Gang

19  Incident were "acting on personal errands." *Id.* Even if these employees were on the clock at the

20  time of the incidents, as the Dupree and Barclay Declarations claim, ECF Nos. 82–83, "the

21  existence or nonexistence of employer benefits is . . . not dispositive in determining vicarious

22  liability." *See Dupree*, 2016 WL 4191653, at *10 (quoting *Le Elder v. Rice*, 21 Cal. App. 4th

23  1604, 1609 (1994)). Instead, because the *purpose* of the employees' activities – repairing,

24  returning, or picking up personal merchandise – was purely personal, the employees were acting

25  outside of the scope of their employment and thus their actions cannot be attributed to Defendant.

26  *See Rice*, 21 Cal. App. 4th at 1608 (finding that employee acted outside the scope of his

27  employment despite deriving benefit from the activity from his employer because the employee's

28
                                                    16

"*purpose* was to take his children to school, a purely personal activity.") (emphasis in original). Thus, these three incidents at most involved statements by non-supervisory coworkers acting outside the scope of their employment.

Plaintiff makes no attempt, either in the TAC or in the opposition to Defendant's motion for summary judgment, to explain how these three incidents "materially affect[ed]" the terms of Plaintiff's employment. *Chuang*, 225 F.3d at 1126. As discussed above, "adverse employment actions" include actions such as "termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion." *Brooks*, 229 F.3d at 928. In contrast, a "few negative encounters," even if they involve a plaintiffs' immediate supervisor, do not qualify as adverse employment actions. *Gonzales v. Marriott Int'l, Inc.*, 142 F. Supp. 3d 961, 984 (C.D. Cal. 2015); *see also Sims v. City & County of San Francisco*, 2015 WL 1351143, *6 (N.D. Cal. Mar. 25, 2015) ("a 'single, isolated discriminatory comment' [even] by [a] plaintiff's immediate supervisor [is] insufficient to trigger burden shift[ing] or to avoid summary judgment for defendant.") (quoting *Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 314–16 (6th Cir.1989)). Similarly, "[s]tray comments are insufficient to establish discrimination." *Patterson v. Apple Computer, Inc.*, 256 F. App'x 165, 168 (9th Cir. 2007).

Unlike cases such as *Gonzales* and *Sims*, the comments in the instant case were not made by Plaintiff's supervisors and were made by co-workers acting outside the scope of their employment. Plaintiff offers no argument or evidence about how these incidents "materially affect[ed] the compensation, terms, conditions, or privileges of . . . employment." *Chuang*, 225 F.3d at 1126; *Horsford*, 132 Cal. App. 4th at 373 (holding that under FEHA, an "adverse employment action" is a "change in the terms and conditions of employment" that is "both substantial and detrimental").

The Shift Change Incident also did not constitute an adverse employment action. Even if Plaintiff was marked tardy for the shift, such minor discipline does not "materially" affect Plaintiff's employment. *Chuang*, 225 F.3d at 1126. Plaintiff does not allege that being marked tardy resulted in any loss of pay or any other changes to his work schedule or conditions. *See*

17

*Nguyen v. McHugh*, 65 F. Supp. 3d 873, 893 (N.D. Cal. 2014) ("A quibble over a 10–minute absence versus a 30–minute absence does not rise to the level of an adverse employment action, even if the difference resulted in a loss of pay for that disputed absence period."); *see also Gonzales v. Marriott Int'l, Inc.*, 142 F. Supp. 3d 961, 984 (C.D. Cal. 2015) ("Gonzales's allegations regarding the inconvenience she experienced in changing her work schedule and missing lunches and social events are not sufficient to plead adverse employment action as a matter of law."). In fact, the Shift Change Incident resulted in a meeting with management in which Flores apologized to Plaintiff. Although Plaintiff claims that Flores "should've received a greater consequence than a meeting an[d] apology," the severity of Flores's punishment is irrelevant to whether Plaintiff was subjected to an adverse employment action. Opp. at 10. For these reasons, the Shift Change Incident was not an adverse employment action.

The Back of House Incident also did not qualify as an adverse employment action. Plaintiff offers no explanation or evidence of how the Back of House Incident "materially affect[ed] the compensation, terms, conditions, or privileges of . . . employment." *Chuang*, 225 F.3d at 1126. Wright, the co-worker who was involved in the Back of House Incident, was not Plaintiff's supervisor and had no influence on any decision made by any of Plaintiff's supervisors. *See McCree v. State of California Dep't of Conservation*, 2014 WL 1936504, at *4 (N.D. Cal. May 14, 2014) (finding that the plaintiff had not made a prima facie case in part because the person who made an offensive comment "was not a decision-maker"). In fact, Wright was disciplined because of the incident, and no action was taken against Plaintiff because of the incident. Thus, the Back of House Incident was not an adverse employment action.

Furthermore, to the extent that Plaintiff bases his discrimination claims on the claim that Plaintiff's supervisors failed to adequately investigate any of the alleged incidents, this too does not qualify as an adverse employment action. As this Court has previously held, "merely failing to investigate workplace complaints does not rise to the level of an adverse employment action." *Nguyen v. McHugh*, 65 F. Supp. 3d 873, 894 (N.D. Cal. 2014); *see also, e.g.*, *Cozzi v. County of Marin*, 787 F. Supp. 2d 1047, 1069 (N.D. Cal. 2011) ("In general, the failure to conduct an

18

adequate investigation after an alleged act of discrimination cannot be considered an action that materially affects the terms, conditions, or privileges of employment under FEHA, and cannot be considered an action that reasonably would deter an employee from engaging in protected activity under Title VII.").

Additionally, the undisputed evidence makes clear that Defendant reasonably investigated each of Plaintiff's complaints using the information that Plaintiff had given. For example, when Plaintiff mentioned the Oakland Incident and the Diversity Program Incident to managers Kris Mallonee and Lindsay Ward, Mallonee and Ward could not determine the nature of the incidents because Plaintiff "did not provide much detail about the alleged incidents," which had occurred "a few days or weeks ago." ECF No. 76-3, ¶ 5, ECF No. 76-4, ¶ 6. Plaintiff identified the individuals involved in the incidents as customers. Had Plaintiff identified Kendall McInerney and Jackson Partin, or even identified the individuals as co-workers, Mallonee and Ward could have conducted a more thorough investigation. Nevertheless, Mallonee and Ward both offered emotional support to Plaintiff. Mallonee and Ward also promptly investigated the Back of House Incident and disciplined Wright after Wright reported the incident. ECF No. 76-3, at 4–9, ECF No. 76-3, ¶¶ 8–10. Additionally, in response to an email detailing a list of incidents (including the Oakland Incident, the Diversity Program Incident, the Gang Incident, the Shift Change Incident, and the Back of House Incident) that Plaintiff "believed to be harassment and retaliation," Regan Cowan, a member of Apple's Retail Employee Relations team, investigated Plaintiff's complaints and found that Plaintiff's allegations "could not be substantiated." ECF No. 76-2, ¶ 9. Indeed, Plaintiff has praised Cowan's investigation. Decl. of Andrew Dupree, ECF No. 80, at 5 ("Regan investigated all incidents regardless of how much or little information she [ob]tained.").

Defendants' offers for Plaintiff to work shifts at Cupertino also did not qualify as an adverse employment action. First, the Court doubts whether it can even consider this claim because the claim is not mentioned in the TAC and was raised for the first time in the opposition to Defendant's motion for summary judgment. *See Shamburger v. Roy*, 50 F.3d 16 (9th Cir. 1995) ("The district court properly refused to consider the new allegation of 'actual injury' raised for the

19

first time in Shamburger's opposition to defendants' motion for summary judgment."); *AJ Reyes v. Educ. Credit Mgmt. Corp.*, 2016 WL 2944294, at *4 (S.D. Cal. May 19, 2016) ("[T]he Court declines to consider Plaintiff's factual allegations raised for the first time in opposition to Defendant's motion for summary judgment.").

Nevertheless, even if the Court considers this new assertion, the undisputed evidence makes clear that Plaintiff was not transferred or reassigned against his wishes. Indeed, in the TAC, Plaintiff specifically alleges that "Plaintiff has been offered many shifts at the Cupertino retail store since the incident in which he was described as looking like he was 'part of a gang,' but has turned them all down due to the outrageous discrimination and harassment he experienced there." TAC ¶ 29. At the June 8, 2017 hearing, Plaintiff stated that "It's not required, of course, to go Cupertino" and that "I never went back to Cupertino after that initial time because of the experience I had there." *See* June 8, 2017 Hearing Transcript at 8, 16; *see also id.* ("He was not required to work at Cupertino, though, after he spoke up and chose not to do so.").

To the contrary, as Plaintiff's TAC alleges, Defendant merely offered Plaintiff the opportunity to take shifts at the Cupertino store in addition to his part-time shifts at the Los Gatos store, and there was no undue pressure involved. TAC ¶ 29. Indeed, Plaintiff has produced evidence that he received messages such as the following:

> Hey there! [The Cupertino store] needs some additional support the week of Jan 2-8. If you're interested in a shift, please reply to this message indicating which you'll take. Reminder: we aren't changing your schedule here @ [Los Gatos], & you have to stay BELOW 40 hours total for the week. Be conscious of both those things when volunteering for shift(s) there!

ECF No. 81, Ex. B. This message indicates that taking shifts was voluntary, that these extra shifts did not affect Plaintiff's shifts at the Los Gatos store, and that Plaintiff should take the shift only "[i]f you're interested." *Id.* Additionally, the evidence that Plaintiff has produced shows only that he received text messages offering shifts at the Cupertino Store on three occasions: on December 8, 2015, on December 22, 2015, and on January 8, 2016. *Id.*

Plaintiff makes no argument explaining how an offer for Plaintiff to take more hours at a different location can constitute an adverse employment action. To the contrary, because Plaintiff

20

was working only part-time at the Los Gatos Apple Store, the opportunity for additional shifts at the Cupertino Store could have provided Plaintiff with additional income. ECF No. 76-2, ¶ 6. Nevertheless, Plaintiff chose not to accept these offers to take shifts at the Cupertino Store, and Defendant did not require Plaintiff to take any shifts.

Furthermore, even if Plaintiff had been required to take shifts at the Cupertino store when he preferred not to do so, this would not qualify as an adverse employment action. *Gonzales*, 142 F. Supp. 3d at 984 ("Gonzales's allegations regarding the inconvenience she experienced in changing her work schedule and missing lunches and social events are not sufficient to plead adverse employment action as a matter of law."). Even a permanent work transfer alone is not an adverse employment action unless it "alters the terms and conditions of the plaintiff's employment in a materially negative way." *Patrolmen's Benevolent Ass'n of City of New York v. City of New York*, 310 F.3d 43, 51 (2d Cir. 2002); *Staff v. Pall Corp.*, 233 F. Supp. 2d 516, 532 (S.D.N.Y. 2002) ("The mere fact that an employee has been transferred or that [her] job responsibilities have changed is not sufficient in itself to show an adverse change in working conditions."). Plaintiff does not identify any materially negative consequences of Defendant's offers that he take shifts at the Cupertino store.

Finally, even if Plaintiff is correct that Plaintiff's coworkers "were not friendly to" Plaintiff after learning about Plaintiff's previous lawsuit with Apple (*Dupree I*), this does not constitute an adverse employment action. June 8, 2017 Hearing Transcript, at 24. As the Ninth Circuit has held, "[b]ecause an employer cannot force employees to socialize with one another, ostracism suffered at the hands of coworkers cannot constitute an adverse employment action." *Brooks*, 229 F.3d at 928. "Indeed, holding an employer liable because its employees refuse to associate with each other might well be unconstitutional . . . ." *Id.* Similarly, "badmouthing an employee" alone, even by a supervisor, does not qualify as an adverse employment action. *Id.* at 929. Thus, even if Plaintiff's coworkers ostracized him or treated him badly, this does not qualify as an adverse employment action.

In short, the undisputed evidence shows that none of the events to which Plaintiff has

pointed constitute an adverse employment action, and therefore Plaintiff cannot establish a *prima facie* claim for discrimination under Title VII or FEHA or a *prima facie* claim for retaliation under Title VII. For that reason, the Court GRANTS Defendant's motion for summary judgment on Plaintiff's discrimination claim under Title VII, Plaintiff's discrimination claim under FEHA, and Plaintiff's retaliation claim under Title VII.

**C. Harassment under Title VII and Harassment and Creation of a Hostile Work Environment under 42 U.S.C. § 1981 and FEHA**

The Court next considers together Plaintiff's claim for harassment under Title VII and Plaintiff's claims for harassment and creation of a hostile work environment under 42 U.S.C. § 1981 and FEHA. To establish a prima facie case for Plaintiff's hostile work environment claim under Title VII, Plaintiff must establish that (1) Plaintiff was "subjected to verbal or physical conduct" because of his race, color, or national origin; (2) "the conduct was unwelcome"; and (3) "the conduct was sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment and create an abusive work environment." *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003) (explaining standard for Title VII and § 1981 claims); *Lyle v. Warner Bros. Television Productions*, 38 Cal. 4th 264, 278-79 (2006) (explaining that standard for harassment under FEHA is the same as that under Title VII).

Defendant argues that the undisputed evidence shows that Plaintiff was not subjected to any conduct that was severe or pervasive enough to give rise to a harassment or hostile work environment claim. For the reasons discussed below, the Court agrees.

In support of Plaintiff's harassment and hostile work environment claims, the TAC, which was drafted with assistance of counsel, points to the Oakland Incident, the Diversity Program Incident, the Gang Incident, the Shift Change Incident, and the Back of the House Incident. TAC ¶¶ 56–59, 80–90, 94–104. In his opposition to the motion for summary judgment, Plaintiff also mentions "pressure to work at the Cupertino store." Opp. at 22.

These incidents are not "sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment and create an abusive work environment." *Manatt*, 339 F.3d at 798 (9th

22

Cir. 2003). As discussed above, the Oakland Incident, the Diversity Program Incident, and the Gang Incident involved non-supervisory co-workers acting outside the scope of their employment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 798 (1998) ("[T]here is no reason to suppose that [in enacting the Civil Rights Act of 1964] Congress wished courts to ignore the traditional distinction between acts falling within the scope and acts amounting to what the older law called frolics or detours from the course of employment."). As discussed below, the Ninth Circuit has held that a hostile work environment did not exist as a matter of law in much more serious circumstances. Thus, the Oakland Incident, the Diversity Program Incident, and the Gang Incident are not sufficient to establish a hostile work environment.

Similarly, the Shift Change incident did not render Plaintiff's work environment hostile. *Cf. Gonzales* 142 F. Supp. 3d at 984 ("Gonzales's allegations regarding the inconvenience she experienced in changing her work schedule and missing lunches and social events are not sufficient to plead adverse employment action as a matter of law."). Even if Plaintiff was marked tardy for the shift, this form of minor discipline is insufficient to establish a hostile work environment. *See Molina v. Los Angeles Cty., Dep't of Mental Health*, 58 F. App'x 311, 315 (9th Cir. 2003) (holding that "loss of an hour's pay" was not an adverse employment action for purposes of retaliation or hostile work environment claim). Indeed, Flores later apologized to Plaintiff because of the incident and gave Plaintiff a hug, which is not indicative of an "abusive working environment." *Clark Cty. School. Dist. v. Breeden*, 532 U.S. 268, 271 (2001).

Additionally, Plaintiff has pointed to no evidence that Flores attempted to change Plaintiff's schedule because of Plaintiff's race. To the contrary, in an interview with Apple's internal investigators, Plaintiff stated that he initially believed that the Shift Change Incident "was a simple misunderstanding," but Plaintiff later concluded that Flores may have been motivated by his knowledge of Plaintiff's previous lawsuit against Apple. ECF No. 76-2, at 13; *see also* Opp. at 8 ("Chad's schedule switch was around the same time as him and other employees learning of Plaintiff's past . . . ."). Nowhere in this interview with Apple's internal investigators does Plaintiff claim that Flores was motivated by Plaintiff's race.

Similarly, the Back of House Incident was not so serious that it "alter[ed] the conditions of" Plaintiff's employment or "creat[ed] an abusive working environment." *Breeden*, 532 U.S. at 271. All other witnesses to the event testified that Wright was speaking in a joking tone, and Wright herself was upset about the incident and reported herself to Mallonee. Additionally, Apple took steps to ensure that this incident did not occur again by giving Wright a written "Misconduct," which is "the most serious behavior-related form of discipline at Apple short of termination." ECF No. 76-4, ¶ 10. In short, although Wright's words were inappropriate, this was a single incident that Defendant took steps to remedy, and thus this incident did not create a hostile work environment.

Furthermore, Plaintiff has produced no evidence that Wright's statement to him had anything to do with Plaintiff's race, as Plaintiff alleges in his harassment and hostile work environment causes of action. In fact, in the TAC and the opposition to the motion for summary judgment, Plaintiff suggests that Wright's statements were primarily motivated by Plaintiff's *gender*. *See* TAC ¶ 36 ("[Wright] has made several insensitive comments on the superiority of women to men, including: 'women have always been better than men at everything,' 'men are stupid, with the rare exception,' 'men can't be victims,' and 'women are due a little payback for how they've been treated.'"); Opp. at 14 ("It's worth noting that Marina [Wright] has claimed feminist values several times and publicly stated her disgust for men at times."). In his opposition, Plaintiff claims that Wright was motivated by Plaintiff's race because one white female co-worker, "Kateland," and one white male co-worker, Jackson Partin, "also made several mistakes in [Back of the House]," but Wright never threatened those co-workers. Opp. at 14. However, as discussed further below, *infra* Part III.D., Plaintiff offers no evidentiary support for these contentions and does not claim that Wright was present when either "Kateland" or Jackson Partin made any of these alleged mistakes.

Finally, the "pressure to work at the Cupertino store" did not create a hostile work environment. Opp. at 22. As discussed above, the undisputed evidence shows that Plaintiff was not forced to take shifts at the Cupertino store. Instead, Plaintiff worked part-time at the Los Gatos

24

Store and was offered extra shifts at the Cupertino Store to provide Plaintiff more hours. Plaintiff received messages telling Plaintiff that he could work these shifts "[i]f you're interested." ECF No. 81, Ex. B. There is no evidence that any requests that Plaintiff work at the Cupertino store were motivated in any way by Plaintiff's race. Thus, these messages offering Plaintiff shifts at the Cupertino store, which were not threatening, belittling, or harmful, do not establish that Plaintiff experienced a hostile work environment. *See Blundell-Zuker v. Oakland Cty. Prob. Court*, 9 F. App'x 318, 319 (6th Cir. 2001) ("In her complaint, Blundell-Zuker referred to the two April meetings when she was told that she could not be accommodated and then offered the transfer to Pontiac as the basis for this claim. The district court properly concluded that this was insufficient to establish the kind of severe and pervasive mistreatment necessary to state a hostile environment claim.").

Even taken together, all of these incidents did not create a hostile work environment. Plaintiff allegedly suffered racially insensitive comments from non-supervisory coworkers acting outside the scope of their employment as well as two other incidents, the Back of House Incident and the Shift Change Incident, for which there is no evidence in the record of any racially discriminatory motivation. As discussed below, the Ninth Circuit has found that much more serious circumstances did not rise to the level of a hostile work environment. Thus, the incidents discussed above were not "sufficiently continuous and concerted in order to be deemed pervasive." *See Faragher*, 524 U.S. at 798, 787 n.1. In short, the undisputed evidence does not show an abusive or hostile work environment that was so severe that it "alter[ed] the conditions" of Plaintiff's employment. *Breeden*, 532 U.S. at 271.

The Ninth Circuit has declined to find racial harassment or a hostile work environment in much more serious circumstances. For example, in *Stevens v. County of San Mateo*, 2006 WL 581092 (N.D. Cal. Mar. 7, 2006), the plaintiff's supervisor had said "[y]ou're my nigger" to the plaintiff "a number of times," and several co-workers had called the plaintiff "OG." *Id.* at *5. Co-workers had also made several disparaging comments about the plaintiff's age, including one co-worker who said, "You are an old lion and in my country we kill old lions." *Id.* Nevertheless, the

district court granted summary judgment in favor of the defendant. The court found that "[t]hese incidents are neither sufficiently severe nor pervasive to constitute an actionable hostile work environment claim," but instead were "only the sort of isolated, sporadic incidents that courts have repeatedly rejected as the basis for a hostile work environment claim." *Id.* The Ninth Circuit affirmed and held that "[b]oth the ageist and racist slurs were too isolated and sporadic to give rise to a hostile working environment." *Stevens v. Cty. of San Mateo*, 267 F. App'x 684, 686 (9th Cir. 2008).

Similarly, in *Sanchez v. City of Santa Ana*, 936 F.2d 1027 (9th Cir, 1990), the plaintiff claimed that at his workplace, the Santa Ana Police Department, co-workers had posted a racially offensive cartoon, used racial slurs, and failed to provide Hispanic police officers with safe vehicles or adequate backup. Nevertheless, the district court granted a directed verdict in favor the defendant on the grounds that "no reasonable person could find" that these actions created a hostile work environment, and the Ninth Circuit affirmed. *Id.* at 1037; *see also Westendorf v. West Coast Contractors of Nevada, Inc.*, 712 F.3d 417 (9th Cir. 2013) (holding that remarks on women's breast sizes, comments about tampons and multiple orgasms, and the suggestion that the plaintiff clean his trailer in a French maid's outfit are not sufficiently pervasive for a hostile environment claim); *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1107-11 (9th Cir. 2000) (finding no hostile work environment where a supervisor referred to women as "bitches" and "histrionics" and referred to a specific woman as a "madonna," "regina," and a "castrating bitch").

Furthermore, even if Plaintiff was subjectively offended or felt uncomfortable because of these events, this subjective belief alone is not sufficient. Instead, to establish a hostile work environment claim, "[t]he working environment must both subjectively and objectively be perceived as abusive." *Brooks*, 229 F.3d at 923. No reasonable trier of fact viewing the undisputed evidence in the instant case could find that the Oakland Incident, the Diversity Program Incident, the Gang Incident, the Shift Change Incident, the Back of House Incident, the pressure to work shifts at the Cupertino store, and Plaintiff's co-workers' lack of friendliness because of Plaintiff's previous lawsuit against Apple are "sufficiently severe or pervasive to alter the conditions of

26

[Plaintiff's] employment and create an abusive work environment." *Manatt*, 339 F.3d at 798.

For these reasons, the Court finds that the undisputed facts show that Plaintiff was not subjected to the serious and pervasive conduct necessary to establish a claim for harassment or hostile work environment. The Court therefore GRANTS Defendant's motion for summary judgment on Plaintiff's claims for harassment under Title VII and harassment and creation of a hostile work environment under 42 U.S.C. § 1981 and FEHA.

### D. Intentional Infliction of Emotional Distress

Plaintiff also asserts a claim for intentional infliction of emotional distress against Apple. In the TAC, Plaintiff bases this claim on the Back of the House Incident. In his opposition to Defendant's motion for summary judgment, however, Plaintiff states more broadly that Defendant committed the tort of intentional infliction of emotional distress "[f]or the same reasons that Apple's conduct was severe and pervasive and created a hostile work environment . . . ." Opp. at 23.

In order to bring a claim for intentional infliction of emotional distress, a plaintiff must show "extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress." *Potter*, 863 P.2d at 819. The defendant's conduct must reasonably cause "such intense, enduring and nontrivial emotional distress that 'no reasonable [person] in a civilized society should be expected to endure it.'" *Schild v. Rubin*, 232 Cal. App. 3d 755, 762–763 (1991) (citations omitted). Thus, "[l]iability for intentional infliction of emotional distress does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Hughes v. Pair*, 209 P.3d 963, 976 (Cal. 2009) (internal quotation marks omitted).

The Court previously granted Defendant's motion to dismiss Plaintiffs claim for intentional infliction of emotional distress in the Second Amended Complaint ("SAC") based on the Oakland Incident, the Diversity Program Incident, the Gang Incident, and other events. *Dupree v. Apple, Inc.*, 2016 WL 4191653, at *11 (N.D. Cal. Aug. 9, 2016). The Court found that Defendant could not be held responsible for the Oakland Incident, the Diversity Program Incident,

27

and the Gang Incident because "employee's torts which are 'personal in nature' do not create employer liability" and "[t]he unidentified Apple employees in the instant case who made racially discriminatory comments were on personal errands." *Id.* However, the Court granted Plaintiff leave to amend his intentional infliction of emotional distress claim because "[i]t [wa]s possible" that Plaintiff could plead other facts showing that Defendant itself committed an actionable tort or "that these employees were acting within the scope of their employment." *Id.* at 10.

However, with the benefit of full discovery, the undisputed evidence confirms that the employees involved in the Oakland Incident, the Diversity Program Incident, and the Gang Incident were "acting on personal errands." *Id.* Even if these employees were on the clock at the time of the incidents, as the Dupree and Barclay Declarations claim, ECF Nos. 82–83, "the existence or nonexistence of employer benefits is . . . not dispositive in determining vicarious liability." *See Dupree*, 2016 WL 4191653, at *10 (quoting *Le Elder v. Rice*, 21 Cal. App. 4th 1604, 1609 (1994)). Instead, because the *purpose* of the employees' activities – repairing, returning, or picking up personal merchandise – was purely personal, the employees were acting outside of the scope of their employment and thus their actions cannot be attributed to Defendant. *See Rice*, 21 Cal. App. 4th at 1608 (finding that employee acted outside the scope of his employment despite deriving benefit from the activity from his employer because the employee's "*purpose* was to take his children to school, a purely personal activity.") (emphasis in original).

Indeed, even if the employees involved in the Oakland Incident, the Diversity Program Incident, and the Gang Incident had been acting within the scope of their employment, Plaintiff still could not hold Defendant liable for those employees' actions in a civil suit. "As a general rule, California's Worker's Compensation Act bars civil actions against an employer for the intentional torts of a co-worker." *Ortiz v. Georgia Pac.*, 973 F. Supp. 2d 1162, 1185 (E.D. Cal. 2013). Instead, for an intentional tort such as intentional infliction of emotional distress, worker's compensation provides the "exclusive remedy . . . against an employer for any injury sustained by his or her employees arising out of and in the course of the employment." *Fretland v. Cty. of Humboldt*, 69 Cal. App. 4th 1478, 1484 (1999). Although there is an exception to this general rule

Case No. 16-CV-00289-LHK
ORDER GRANTING SUMMARY JUDGMENT

if the conduct "exceeded the normal risks of the employment relationship," Plaintiff has not claimed that such an exception is applicable here. *Fretland*, 69 Cal. App. 4th at 1492.

Finally, even if Plaintiff could hold Defendant responsible for the conduct of Plaintiff's co-workers in this action, Plaintiff's claim would fail because the incidents discussed above "do[] not give rise to a cause of action for intentional infliction of emotional distress." *Dupree*, 2016 WL 4191653, at *8; *see also King v. AC & R Advertising*, 65 F.3d 764 (9th Cir.1995) (finding no extreme and outrageous conduct when employer allegedly changed employee's status to at-will, restructured his compensation package, terminated him after he rejected proposal and subsequently rehired him, and made age-related comments); *Schneider v. TRW, Inc.*, 938 F.2d 986, 992–93 (9th Cir.1991) (no intentional infliction of emotional distress where plaintiff's evidence showed her supervisor screamed, yelled, and made threatening gestures while criticizing her job performance); *Yurick v. Superior Court*, 209 Cal. App. 3d 1116, 1123–30 (Ct. App. 1989) (comments that plaintiff was over forty and senile did not give rise to claim for intentional infliction of emotional distress).

In short, the undisputed evidence shows that under relevant caselaw, Plaintiff was not subject to "extreme and outrageous conduct" within the meaning of the tort of intentional infliction of emotional distress. *Potter*, 863 P.2d at 819. The Court therefore GRANTS Defendant's motion for summary judgment on Plaintiff's claim for intentional infliction of emotional distress.

### E. Violation of Ralph Act

Finally, Defendant moves for summary judgment on Plaintiff's Ralph Act claim. The California Ralph Civil Rights Act was enacted to "provide a civil remedy for hate crimes." *D.C. v. Harvard-Westlake School*, 176 Cal. App. 4th 836, 844 (2009). The Ralph Act guarantees that "[a]ll persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of" a protected attribute, including "sex, race, color, . . . [or] national origin." CAL. CIV. CODE §§ 51.7. 51(b). In order to establish a Ralph Act claim, Plaintiff must establish that (1) Defendant

committed or threatened violent acts against Plaintiff; (2) a substantial motivating reason for the violent acts was Plaintiff's sex, race, color, national origin, or other protected characteristic; (3) Plaintiff was harmed; and (4) Defendant's conduct was a substantial factor in causing Plaintiff's harm. *See, e.g.*, *Hernandez v. City of San Jose*, 2016 WL 5944095, at *11 (N.D. Cal. Oct. 13, 2016) (outlining elements of Ralph Act claim).

Plaintiff claims that Defendant is liable for Marina Wright's conduct in the Back of House Incident. In the original complaint, the FAC, the SAC, and the TAC, Plaintiff alleged that Wright's conduct was motivated by Plaintiff's gender. *See* TAC ¶ 92 ("This co-worker who threatened [Plaintiff] has made several hurtful comments about men in the past. This leads Plaintiff to believe her threat was at least in part motivated by Plaintiff's gender."). However, in his opposition to Defendant's motion for summary judgment, Plaintiff asserts for the first time that the ground for his Ralph Act claim is that "[a] substantial motivating reason [for Wright's conduct] was Plaintiff's *race*." Opp. at 23 (emphasis added).

Plaintiff has produced no evidence that Wright was substantially motivated either by Plaintiff's gender or Plaintiff's race. Indeed, in the factual background portion of Plaintiff's opposition to the motion for summary judgment, Plaintiff mostly focuses on the claim that the Back of the House Incident was motivated by Wright's knowledge that Plaintiff had previously sued Apple, which Wright allegedly learned from another co-worker. *See, e.g.*, Opp. at 14 ("[Wright] and [the other co-worker] are very close both in and outside of work. Therefore, it should be assumed that [the co-worker's] reaction and subsequent treatment of Plaintiff would also be [Wright's] attitude and actions as well.").

Plaintiff mentions two facts in his opposition to summary judgment in support of his contention that Wright acted because of Plaintiff's gender or race. First, Plaintiff claims that one white female co-worker, "Kateland," and one white male co-worker, Jackson Partin, "also made several mistakes in [Back of the House]," but Wright never threatened those co-workers. Opp. at 14. However, Plaintiff offers no evidentiary support for these contentions, nor does Plaintiff claim that Wright was present when either "Kateland" or Jackson Partin made any of these alleged

30

mistakes. Indeed, at the June 8, 2017 hearing, Plaintiff stated that he had never seen Jackson Partin before or after the Diversity Program Incident, in which Partin was allegedly involved. *See* June 8, 2017 Hearing Transcript, at 14 ("I was not able to see him before or after and I only saw him that one time."). Additionally, even if Wright had been present when Jackson Partin, who is a man, made mistakes, and Wright did not threaten Partin, this would undermine Plaintiff's claim that Wright acted against Plaintiff because of her prejudice against men.

Second, in his opposition Plaintiff claims that Wright "has claimed feminist values several times and publicly stated her disgust for men at times." Opp. at 14. Again, Plaintiff offers no evidence of these claims. Furthermore, the fact that Wright holds "feminist values" does not support an inference that Wright targeted Plaintiff because of his gender. *Id.* Additionally, even if Wright had "stated her disgust for men at times," this does not indicate that the Back of House Incident was motivated by gender. *Id.* Indeed, as discussed above, Plaintiff has claimed that Wright did not threaten at least one other male co-worker, Jackson Partin, who "also made several mistakes" in the Back of the House. Opp. at 22.

In short, even if Wright's comments in the Back of House incident rose to the level of an actionable threat, Plaintiff has offered no evidence other than his own subjective belief that Wright was motivated by Plaintiff's gender or race. *Gomez v. City of Fremont*, 730 F. Supp. 2d 1056, 1069 (N.D. Cal. 2010) (granting summary judgment on § 51.7 claim because the plaintiff "had only a subjective belief, and not any evidence, that [the defendants] were motived by his ethnicity"); *Jaramillo v. City of San Mateo*, 76 F. Supp. 3d 905, 928 (N.D. Cal. 2014) ("Because Jaramillo has not presented evidence, aside from his subjective belief that the officers were motivated by prejudice against Jaramillo because he is Hispanic, the Court GRANTS the officers' and the City's motion [for judgment as a matter of law] as to this claim under § 51.7.") (internal citations and alterations omitted). This type of uncorroborated opinion about the subjective beliefs of another is not sufficient to create a genuine dispute of fact. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) ("[T]his court has refused to find a "genuine issue" where the only evidence presented is "uncorroborated and self-serving"

Case No. 16-CV-00289-LHK
ORDER GRANTING SUMMARY JUDGMENT

testimony."). This is especially true considering Plaintiff's shifting theories about whether Wright was motivated by gender, race, or Plaintiff's prior lawsuit against Apple. *See, e.g.*, *AJ Reyes*, 2016 WL 2944294, at *4 ("[T]he Court declines to consider Plaintiff's factual allegations raised for the first time in opposition to Defendant's motion for summary judgment.");

For these reasons, the Court finds that Plaintiff has not presented evidence to raise a disputed issue of fact regarding whether Wright was motivated by gender or racial animus in the Back of the House Incident. Therefore, Plaintiff cannot establish this essential element of Plaintiff's Ralph Act claim, and the Court therefore GRANTS Defendant's motion for summary on Plaintiff's Ralph Act Claim.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's motion for summary judgment on all claims. Plaintiff's motion for appointment of counsel is DENIED AS MOOT.

**IT IS SO ORDERED.**

Dated: June 16, 2017

_____
LUCY H. KOH
United States District Judge

Case No. 16-CV-00289-LHK
ORDER GRANTING SUMMARY JUDGMENT